**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| JERRY DAVIS, individually as Surviving Spouse and on Behalf of the Wrongful Death Beneficiaries of Dorothy Davis, Deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | NO. 2:21-CV-00047 |
| v. | ) ) | |
| CARTHAGE OPCO, LLC d/b/a SMITH COUNTY HEALTH AND REHABILITATION; and CLEARVIEW HEALTHCARE MANAGEMENT TN, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION**</u>

Before this Court is Clearview Healthcare Management TN, LLC's ("Clearview") Motion for Summary Judgment (Doc. No. 89) on the Jerry Davis' ("Davis") two claims against Clearview. The basis for the motion is that Davis is unable to carry his burden of proof and as such, no genuine issue of material fact exists and Clearview is entitled to a judgment as a matter of law. Because the Court finds that genuine disputed issues of material fact exist, on both claims, the motion will be denied.

### I. Undisputed Facts and Procedural History

Davis is the surviving spouse of Dorothy Davis. (Doc. No. 1 at 1). From December 2020 until January 2021, Mrs. Davis was a resident of Smith County Health and Rehabilitation ("Smith County" or "Facility"). (Doc. No. 1 at 4, ¶ 9). Carthage OPCO, LLC d/b/a Smith County Health and Rehabilitation's ("Carthage") and Clearview ("Defendants") admit in their responses to Davis'

1

interrogatories that Smith County was operated by Carthage and managed by Clearview during Ms. Davis's residency. (Doc. No. 93-2 at 9, ¶ 8 & Doc. No. 93-3 at 9, ¶ 8). According to the report prepared by Davis's expert, on January 8, 2021, after Ms. Davis fell, she was transported to the hospital and passed away a few hours later. (Doc. No. 93-1 at 11). The cause of death was listed as "sepsis from an unknown organism compounded by acute renal failure." (Doc. No. 93-1 at 12).

Davis filed this case alleging one count of "Negligence pursuant to the Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-115" and one count of "Gross Negligence, Willful, Wanton, Reckless, Malicious and/or Intentional Misconduct" against Defendants. (Doc. No. 1 at 5-8). [1]

## II. Legal Standard

Summary judgment is tailored relief that is only appropriate where "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Moody v. Foster, No. 3:20-cv-01086, 2023 U.S. Dist. LEXIS 42535, at * 2 (M.D. Tenn. Mar. 14, 2023), *aff'd* No. 23-5317, 2024 U.S. App. LEXIS 10384 (6th Cir. Apr. 29, 2024) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

---

[1] In addition to his response to Clearview's Statement of Undisputed Material Facts, Davis included additional factual assertions titled "Additional Facts". (Doc. No. 93 at 3-5, ¶¶ 6-14). The Court declines to consider these because Local Rule 56.01 no longer authorizes a nonmoving party to file an additional statement of facts. See M.D. Tenn. R. 56.01 (eff. May 15, 2025); Nash. Commc'ns, Inc. v. Auto-Owners (Mut.) Ins. Co., 809 F. Supp. 3d 791, 799 (M.D. Tenn. 2025) ("Although this court's Local Rules formerly authorized a party opposing summary judgment to file a statement of additional facts that the party believed created a material factual dispute precluding summary judgment, that provision was eliminated in the May 2025 amendments to the Local Rules."). Clearview was not required to --- and did not --- respond to Davis' additional factual assertions and considering them would be inconsistent with the governing summary judgment local procedure.

2

(emphasis in original)). Hence, "a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment." Id. A fact is determined to be material for purposes of Rule 56 only "if the dispute over it might affect the outcome of the lawsuit under the governing law," Id. (quoting O'Donnell v. City of Cleveland, 838 F.3d 718, 725 (6th Cir. 2016)), and a dispute becomes genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. (quoting Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018)).

The moving party has the initial burden to identify and cite "specific portions of the record…[that] demonstrate the absence of a genuine dispute over material facts." Id. at *2-3. If it does so, the non-moving party need only prove that a fact is genuinely disputed by citing parts of the record. Fed. R. Civ. P. 56(c)(1)(A); see Pittman v. Experian Info. Sols., Inc., 901 F.3d 619, 628 (6th Cir. 2018) ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'").

The Court views the evidence and draws all reasonable inferences in favor of the non-moving party asking, "whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict." Mitchell v. Toledo Hosp., 964 F.2d 577, 581-582 (6th Cir. 1992). If after a reasonable period of discovery, "the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case," summary judgment is warranted. Id. at 582.

### III.    ANALYSIS

To prevail in a medical malpractice action, which "essentially codifies the common law elements of negligence," Tenn. Code Ann. § 29-26-115 requires that a plaintiff prove by admissible evidence: "(1) the recognized standard of professional care; (2) that a defendant failed

to act in accordance with the applicable standard of care; and (3) that as a proximate result of the defendant's negligent act or omission, the claimant suffered an injury which otherwise would not have occurred." Gunter v. Lab. Corp. of Am., 121 S.W.3d 636, 639-640 (Tenn. 2003).

### A. Duty

Clearview first attacks the existence of any duty owed to Ms. Davis. Previously, the Tennessee Supreme Court has found a special relationship between a nursing home and its resident that gave rise to an affirmative duty when it "voluntarily assume[d] an obligation to provide care for those who are unable because of physical or mental impairment to provide care for themselves." Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 79-80 (Tenn. 2001) (internal quotation marks omitted). That duty required the nursing home to "exercise reasonable care to protect its residents from all foreseeable harms 'within the general field of danger which should have been anticipated.'" Id. at 80.

In Tennessee, this affirmative duty may extend to those parties that manage nursing facilities when, by exercising actual authority and control over the facility's operation, they assume the responsibility for the care and safety of the residents. See Tenn. Code Ann. 29-26-102(a) ("a health care liability action against a licensee may be brought only against the licensee, *the licensee's management company*…") (emphasis added); see also Wilson v. Americare Sys., Inc., 397 S.W.3d 552 (Tenn. 2013) (upholding a management company's liability where material evidence showed that its control over staffing decisions contributed to a resident's death); see also Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC, No. W2017-00957-COA-R3-CV, 2018

4

Tenn. App. LEXIS 450 (Tenn. Ct. App. Aug. 6, 2018) (finding that a management company was directly liable where the evidence showed its active participation in the facility's operation.).[2]

Clearview portrays itself as merely providing advisory services without maintaining any actual operational control of the facility and as a result, owed no duty to the residents. (Doc. Nos. 90, 94). The Court agrees that the management agreement ("Agreement") expressly grants Carthage, as the Operator, authority over operational decisions and provides that all staff are its employees. (Doc. No. 93-4 at 4, 7 §§ 2.3, 4.1(b)). The summary judgment evidentiary record, however, establishes that Clearview's involvement extended beyond financial matters.

Defendants' own admissions show that Clearview actively managed the Facility. It did indeed maintain its finance department, including incurring expenses necessary for "all costs of staffing the Facility and providing Resident care[.]" (Doc. No. 93-4 at 5-6, §§ 3.1-3.2). However, it had the authority to recommend staff for employment, including the administrator for the day-to-day administration of the Facility, and allowed Clearview to place its own personnel in key leadership positions --- including as administrator, director of nursing, or department head --- and to receive reimbursement for their salaries. (Doc. No. 93-4 at 7, §4.1(b)). Moreover, while ultimately employees of Carthage, Clearview was tasked with developing an approved budget that

---

[2] Clearview argues that as an independent contractor, it cannot be held liable for any negligence on part of the Operator, Carthage. (Doc. No. 94 at 3). However, the issue is not whether Clearview as the managing company is liable for the Operator's alleged negligence; instead, the issue concerns whether Clearview as the manager of the Facility owed a duty to the residents --- the very issue Clearview placed before this Court in its motion. (Doc. No. 90 at 2) ("Here the Plaintiff has not and cannot offer evidence that *Clearview* owed a duty to Dorothey Davis[.]") (emphasis added). While its status as an independent contractor would be relevant if imputed liability were at issue in the motion for summary judgment, it does not negate any potential liability when determining if the management company itself owed an affirmative duty arising from its conduct and assumption of obligations and then subsequently breached said duty. See Fed. Ins. Co. v. Winters, 354 S.W.3d 287, 295 (Tenn. 2011) (recognizing that, although employers are generally not liable for the negligence of their independent contractors, that rule "has no application to…separate contractual responsibilities" arising from a party's own contractual undertaking).

5

provided "competitive [s]alaries and [b]enefits so as to attract and retain a sufficient number of capable employees to enable the Facility to operate." (Doc. No. 93-4 at 7, §4.1(b)). By its plain language, the Agreement contemplates affirmative involvement in securing the Facility's staff, extending beyond purely financial considerations.

Beyond staffing, Clearview could also enter into or renew service contracts to oversee the efficient running of the Facility. This included services involved in resident care such as "pharmaceuticals and medical supplies, pharmacy consulting, medical director, physical and speech therapy, hospice services, medical equipment, and other services in the ordinary course of the operation of the Facility; purchase all supplies and equipment necessary to maintain and so operate the Facility[.]" (Doc. No. 93-4 at 7, §4.1(c)). The Agreement supports a reasonable inference that Clearview was required to assess the Facility's operational needs, identify appropriate resources, and facilitate the transactions necessary to meet those needs. Clearview was also obligated to assist in "obtaining and maintaining all licenses and certifications required for operation of the Facility," and retained authority to pursue certain legal recourse on Carthage's behalf.[3] (Doc. No. 93-4 at 9, §4.1(i), (k)).

The Agreement further vested Clearview with broader authority to make operational decisions and recommendations in nonemergency or emergency circumstances, confirming that Clearview's role extended beyond a passive advisory function. (Doc. No. 93-4 at 10, §4.2) ("Whenever Manager determines that a service or services not included in the Basic Services required to be rendered pursuant to the Agreement (and not constituting an emergency) is

---

[3] Clearview maintains the agreement contains provisions disclaiming any liability on its part, albeit not for gross negligence, which Davis alleges. However, the Court need not resolve the Clearview's broader arguments concerning the Agreement's allocation of contractual liability. Those provisions do not, standing alone, resolve the factual issue of whether Clearview exercised actual authority and control over the Facility's operations sufficient to give rise to a legal duty.

6

necessary or desirable for the efficient, economic, and profitable operation of the Facility (collectively, the "Extraordinary Services"), Manager shall advise the Operator of the need and cost[.]"); (Doc. No. 93-4 at 11, §4.3) ("any and all emergency repairs or services immediately necessary for the preservation and/or safety of the Facility…to avoid danger of life or property, or to preserve the use of the Facility for the Existing Uses.").

As to the foreseeability of the danger, which bears directly on whether a duty should be imposed, the summary judgment evidence reflects that the risk of both Mrs. Davis falling and developing a post-operative infection was foreseeable. First, prior to being admitted, Mrs. Davis had been deemed a fall risk. Subsequently, she was evaluated as a fall risk and certain, if underwhelming, measures were taken by the Facility. According to Davis's expert report, her medical records indicated that she had previously attempted unsuccessfully to get up on her own. (Doc. No. 93-1 at 5). Consequently, it was certainly foreseeable that Mrs. Davis, without proper measures, would be at risk of falling. This is a reasonable conclusion because 10 days after admission, Mrs. Davis fell.

As to the risk of developing an infection, the summary judgment record also indicates that certain daily medical interventions were ordered and not followed. Mrs. Davis' medical records show time gaps, days at a time, when no proper wound care was given. (Doc. No. 93-1 at 7-8). Furthermore, when her surgeon came to visit Mrs. Davis, he also expressed his concern about infection and prescribed additional antibiotics. (Doc. No. 93-1 at 11). Close to the time of her passing, Mrs. Davis exhibited signs of infection, including a fever, along with other medical complications, and yet, she was not transported to the hospital until she became unresponsive. (Doc. No. 93-1 at 10-11).

7

Obviously, if Clearview had neither known nor had reason to foresee any danger or otherwise know that certain precautions were necessary, no liability would attach. <u>Limbaugh</u>, 59 S.W.3d at 80. However, that is not the case here. While it may be true that the evidence on summary judgment is not substantial, the Court's role at the motion for summary judgment stage is to view the evidence and draw all reasonable inferences in the non-moving party's favor. Doing so, this Court finds that Davis has put forth sufficient evidence that creates a genuine dispute as to whether Clearview was directly involved in the Facility's daily operations and exercised sufficient control over its operation such that a duty to protect the residents from all foreseeable harms was owed.

## B. Breach and Causation

Clearview also asserts that Davis has provided no evidence of (1) a breach or (2) causation as to any injury. Viewing the evidence in favor of the non-moving party, this Court finds that Davis has presented material evidence from which the jury could reasonably conclude Clearview breached its responsibilities toward Mrs. Davis. Since the beginning of her stay, Davis' expert maintains there were several issues with Clearview management and services provided by the Facility. To start, an admission assessment should have been conducted because she had been previously deemed a fall risk. (<u>See</u> Doc. No. 93-1 at 3-4). Instead, a Care Plan Focus was in place noting interventions listed were to anticipate her needs and place a call button within her reach. (Doc. No. 93-1 at 5). Another fall-risk focus assessment was conducted the following day that adopted the exact same interventions. (<u>Id.</u>). Although the medical records from the day before her fall indicated that Mrs. Davis had attempted to get up on her own, no additional precautions were noted. (Doc. No. 93-1 at 5, 7).

8

Approximately 10 days after admission, Mrs. Davis fell and suffered a right femoral neck fracture. (Doc. No. 93-1 at 6). She underwent surgery the next day. (Doc. No. 93-1 at 6). According to the expert's report, the preventative measures were simply inadequate and did not provide a safe environment for Mrs. Davis. (Doc. No. 93-1 at 12). The standard of care demanded the Facility to "conduct a fall risk assessment prior to the fall on December 12, 2020" and incorporate adequate fall preventative measures beyond "anticipating needs and keeping the call light within reach". (Doc. No. 93-1 at 12). The facility failed in this regard. But for this failure, Mrs. Davis "more likely than not would not have suffered" her December 12, 2020 fall that ultimately led to infection and death shortly afterwards. (Doc. No. 93-1 at 12-13).

Two days after her surgery, Mrs. Davis was once again readmitted to the facility with no readmission assessment completed to reevaluate her new needs. (Doc. No. 93-1 at 7). The only documented change in her care plan was to add "non-skid strips in front of closet." (Id.). As to her medical care, the records indicate that while the medical order mandated the "cleaning [of her] right hip incision," antibiotics, and pain medication "every 6 hours as needed," such orders were not followed. (Doc. No. 93-1 at 7-8, 12-13). Instead, the expert report says that Ms. Davis was kept without pain relief from December 15 through December 17, even though she was registering pain levels of 9/10. (Doc. No. 93-1 at 8). Additionally, the requested daily wound cleaning was reduced to approximately every two-to-three days, at times, even every five days; the needed barrier cream being applied interstitially. (Doc. No. 93-1 at 7-8, 12-13). Her first registered dosage of oxycodone for 5 mg was administered at 10:00pm on December 17, 2020. (Doc. No. 93-1 at 9).

According to Davis's expert, although there were several sources of concern including signs of being lethargic and the onset of infection, (Doc. No. 93-1 at 9-11), the Facility failed to properly "notify the physician of significant changes in [her] wound" and failed "to initiate an

urgent hospital transfer once she was critically ill." (Doc. No. 93-1 at 12). This failure caused her "to undergo unnecessary pain and suffering." (Id.). Moreover, the staff failed to take the time to properly chart the type, time, and results of their care. (Doc. No. 93-1 at 12-13). More alarming, when Mrs. Davis' surgeon came to visit her a day before her hospitalization and expressed concern with regards to infection, he prescribed additional antibiotics. (Doc. No. 93-1 at 11). The following night, Mrs. Davis was noted to be very hard to wake up and was only responsive to aggressive stimuli. (Id.). And yet, she was not monitored further until the following morning when she was found to be unresponsive. (Id.). Only then was she transported to the hospital in critical condition. (Id.). "At the hospital, multiple cultures were taken" which found that her "right hip showed mixed flora." (Id.). She passed later that same day with cause of death ruled as "sepsis from an unknown organism compounded by acute renal failure." (Doc. No. 93-1 at 11-12).

According to the expert's opinion, Mrs. Davis should have been immediately transferred to the hospital when she was only responsive to aggressive stimuli on the night of January 7, 2021 instead of waiting until the morning of the following day. (Doc. No. 93-1 at 12). Furthermore, the staff failed to "maintain complete and accurate medical records." (Id.). These actions and inactions go directly to the contractual obligations set out in the Agreement and reasonably had a direct impact on Ms. Davis's care. Thus, in reviewing the evidence relied on in its response, Davis has met his burden and presented material evidence supporting a conclusion that the deviation from the applicable standard of care provided by Davis's expert could have been a substantial factor in Ms. Davis's death. Clearly there is disagreement about what that reasonable care encompasses as the Defendants maintain they have met such a care if such a duty was owed. Davis's expert opines otherwise. This seems to be a battle of experts. This Court, however, does not weigh the evidence

or judge the credibility of witnesses such as experts or determine the truth of the matter. <u>Anderson</u>, 477 U.S. at 249. Those questions are for the jury. <u>See</u> <u>Id</u>.

As to causation, this is an element that generally is a question of fact for the jury. <u>Wilson</u>, 397 S.W.3d at 563. "It is the jury's province to determine the facts and the inferences to be drawn from them." <u>Id</u>. "Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury." <u>Id.</u> at 559. These issues with staffing, inconsistent treatment, and failure to comply with medical orders could support more than one reasonable conclusion. Therefore, it is appropriately within the jury's purview. There is enough here for a reasonable person to determine that after assuming the responsibility of the residents, Clearview could be found to have breached its duty and caused injury.

The Court denies the motion for summary judgment.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE